STATE v. TALKINGTON et al.   (No. 6848.)

(Court of Civil Appeals of Texas. Austin. May 6, 1925.)

1. Boundaries ⬅3(5)—In absence of call for natural or artificial objects, lines and corners controlled by course and distance from nearest recognized and established corners or artificial objects.

In absence of objects, either natural or artificial, called for in field notes, by which lines of survey can be located on ground, location of lines and corners will be controlled by course and distance from nearest recognized and established corners or artificial objects with which such field notes connect.

2. Boundaries ⬅10 — Location of land determined by survey, as evidenced by field notes, rather than by patent.

Location of survey, calling for line of another tract *held* determined by survey of such other tract, as evidenced by field notes, rather than by patent.

3. Boundaries ⬅10—Survey cannot be located by artificial objects not called for in field notes.

Survey cannot be located by artificial objects not called for in field notes.

4. Boundaries ⬅48(1) — Recognition by adjoining owners of fence lines, held not to affect location, as against state.

Recognition by adjoining owners of fence lines, so as to include part of public domain, not in fact included in survey, in no way affects location of such lands as against state.

5. Boundaries ⬅25—If field notes of survey conflict, notes of senior survey control.

In dispute as to boundary, if field notes of surveys conflict, field notes of senior survey control.

6. Public lands ⬅175(5)—Changing boundary line on resurvey held to make land left thereby unappropriated vacant land, which state could recover.

Where tract was resurveyed and its line moved eastward, adjoining survey on west, whose field notes called for line of resurveyed tract, could not follow it eastward, and include more of public domain than its original field notes called for, and land left between them by resurvey constituted unappropriated vacant land, which state was entitled to recover.

7. Boundaries ⬅25—Lines of survey run from old established survey must control boundary, as against calls from junior survey.

In dispute as to boundary lines, survey run from old established surveys must control, instead of calls from junior surveys.

8. Boundaries ⬅10 — Survey corrected, because of resurvey of line called for, held controlled by corner of another survey.

Where surveyor, after making field notes, calling for corner of one survey on line of another, discovered that line referred to had been moved, and that corner called for was not on

line called for, and corrected field notes so as to eliminate call for line, and as provided by Rev. St. 1911, art. 5346 certified correction to commissioner of general land office, location of corner called for controlled.

9. Boundaries ⬅10—Field notes of surveyor held to determine location of land, as against error in patent.

In case of disputed land boundaries, so far as can be done, the steps of surveyor on ground must be followed, and his field notes, rather than those erroneously inserted in patent, determine location of land.

10. Boundaries ⬅11—Survey, built on adjoining survey, held to leave an unappropriated tract of same width as that left by survey on which it was built.

Where original survey of tract was made on same day as that of tract adjoining, and built on such survey by use of directions and distances, without calling for material objects establishing corners, and closed second survey with call north to southeast corner of prior survey, second survey left same vacancy between it and adjoining tract on east as did first survey.

11. Boundaries ⬅37(1)—Evidence held sufficient to support finding of trial court that there was no unappropriated land between surveys.

In suit by state to recover vacant school land, evidence *held* sufficient to sustain trial court's finding that no vacancy existed between two designated surveys.

Appeal from District Court, Travis County; Cooper Sansom, Judge.

Suit by the State against Alice Allen Talkington and others. Judgment for defendants, and the State appeals. Affirmed in part, and reversed and rendered in part.

W. A. Keeling, Atty. Gen., W. W. Caves, Asst. Atty. Gen., and G. B. Smedley, of Wichita Falls, for the State.

Homer B. Latham, of Bowie, for appellees Talkington and others.

John G. Gregg, of Fort Worth, for appellee Gulf Production Co.

W. O. Davis, of Gainesville, for appellee Carl M. Worsham.

Benson & Benson, of Bowie, for appellees J. T. Prater and others.

BAUGH, J. This is a suit by the state of Texas to recover as vacant school land in Montague county, from the several claimants thereof, the land included within the boundaries indicated on the accompanying map by the letters C, E, G, K, I, J. The case was tried to the court without a jury, and judgment rendered denying the state a recovery of any of this land, from which judgment it has appealed. The map is practically an exact copy of the maps of these various surveys as same appeared in the general land office at the time of the trial.

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The land in dispute, alleged to be vacant, is due to .changes in the west boundary line of the Abel A. Lewis survey. The original survey of the Lewis was made April 2, 1860. At that time the Asa Massie and the John W. Massie surveys were well established, and the southwest corner of the John W. Massie, which was also the northwest corner of the Asa Massie, marked A on the map, was established and identified on the ground. This original survey called to run west from this Massie corner a distance of 3,330 varas to a "corner in prairie" for the Lewis; thence south to the Jack county school land, to a "corner in prairie," which line is indicated on the map as E, H. The Lewis was resurveyed in April, 1869, passing the established Massie corner at point A, running west 2,961 varas to "a post in prairie," thence south to a "corner in the prairie," being the line D, I, indicated on the map. The Lewis was again resurveyed December 29, 1873, in which its northwest corner was placed at a still different distance from the Massie corner. This survey, however, has no bearing on the issues raised. A fourth survey, on which the Lewis was patented, was made July 23, 1874. This last survey of the Lewis began at the southeast corner of the John W. Massie and went around in the opposite direction from former surveys, established the southwest corner of the Lewis by natural objects, ran north therefrom to a "pile of stone" for the northwest corner, thence east 2,918 varas to the common Massie corner, leaving line C J as the west boundary of the Lewis. In none of these surveys is the northwest corner of the Lewis fixed by any natural object, and only the last calls for an artificial object likely to be preserved. So far as the record shows, none but the patented west line of the Lewis appears to have been definitely located on the ground.

The first question raised involves the proper location of the south and lower east lines of the W. R. Matlock survey No. 40. This tract was surveyed in July, 1860, to contain 640 acres of land, and was subsequently patented on the field notes then made. There seems to be little or no dispute but that the west line of survey 40, which is the east line of survey 39, is located as indicated on the map. The field notes of this survey and of the patent give to said survey No. 40 its complement of acreage. The south lines of No. 40 are called to run from the southeast corner of survey No. 39 east 1,338 varas to the west line of the Lewis; thence north 777 varas to the northwest corner of the Lewis; thence east 954 varas to a mound in the Lewis north line; thence north, etc., on around to the point of beginning.

[1, 2] Necessarily the surveyor of No. 40 located it with reference to the field notes of the Lewis as they existed at the time he surveyed No. 40. At that time these field notes called for the west line of the Lewis at 3,330 varas west of the common Massie corner. There were no objects, either natural or artificial, called for in the field notes of either survey by which the lines could be located on the ground. In the absence thereof, the location of lines and corners will be controlled by course and distance from the nearest recognized and established corners or artificial objects with which such field notes connect. Brooks v. Slaughter (Tex. Civ. App.) 218 S. W. 632; Kerr v. State (Tex. Civ. App.) 205 S. W. 474; Prairie Oil & Gas Co. v. State (Tex. Civ. App.) 229 S. W. 585; Ratliff v. Burleson, 7 Tex. Civ. App. 621, 25 S. W. 983, 26 S. W. 1003. Nor does the line of the Lewis as called for in the patent control. It has long been settled in this state that the location of land is determined by the survey on the ground as evidenced by the field notes, rather than by the patent. Morrill v. Bartlett, 58 Tex. 649; Gammage v. Powell, 61 Tex. 629; Taylor v. Brown (Tex. Civ. App.) 39 S. W. 312; State v. Post (Tex. Civ. App.) 169 S. W. 405, 407; Brooks v. Slaughter (Tex. Civ. App.) 218 S. W. 632. There was testimony that a fence on this patented west line of the Lewis had been recognized by the owners of the Lewis and Matlock surveys as the boundary line between the two surveys since 1890; and that a marked rock was found on the patented west line of the Lewis, 1,730 varas east of the southeast corner of No. 39. But no such rock or distance is called for either in the field notes or in the patent of survey No. 40.

[3, 4] A survey cannot be located by artificial objects not called for in the field notes. Reast v. Donald, 84 Tex. 653, 19 S. W. 795; Hamilton v. Blackburn, 43 Tex. Civ. App. 153, 95 S. W. 1094; Ratliff v. Burleson, 7 Tex. Civ. App. 621, 25 S. W. 983. Nor could the recognition by adjoining owners of a fence line, so as to include therein a part of the public domain, when not in fact included within a survey, in any way affect the location of such lands as against the state. See Ratliff v. Burleson, supra.

[5] The actual survey of the Matlock No. 40, as contended for by appellees, in order to eliminate the vacancy contended for by the state, requires a continuation of its lower south line from the southeast corner of section No. 39, a distance of 1,732 varas instead of 1,338, as called for in its field notes, in order to reach the patented line of the Lewis survey. The lower south line is thus extended 394 varas over the distance called for in its original field notes. The upper south line of said survey 40, which is called for in the original field notes to run east 954 varas to a corner, is surveyed to run only 348 varas from the patented northwest corner of the Lewis, marked C on the map, to the southwest corner of the Ownsby survey. This survey, as contended for by appellees, thus reduces the east to west dimension of No. 40 from a total of 2,292 varas

called for in the original field notes, to 2,080 varas, and as thus surveyed gives section 40 an excess of about 12 acres. Appellees contend, however, that the east to west dimensions of the Matlock must be shortened in order to give the Ownsby its complement of land. This position, however, is untenable for the reason that the Ownsby was surveyed 8 or 10 years after the Matlock, and calls for the corner of the Matlock as its southwest corner. But even if there were a conflict in field notes, the Ownsby is a junior survey to the Matlock, and the field notes of the senior survey control. See Post v. State, supra. Accordingly, if the Matlock had been run east its full 2,292 varas,. and also extended on its lower south line to reach the Lewis survey, its excess would have been about 61 acres, for which the state was not paid.

[6] Without further reviewing the evidence we think it clearly shows that the lower east line of section 40 was fixed by the surveyor at a point 1,338 varas east of the southeast corner of section 39, which corner appears established and recognized. When so surveyed, it was manifestly on the west line of the Lewis according to the then field notes of the Lewis. But when the Lewis was resurveyed, and its line moved eastward, as indicated by the lessened distance to the Massie corner, the Matlock could not follow it eastward and include more of the public domain than its original field notes called for. The land thus left by the resurvey of the Lewis between it and the Matlock No. 40 constituted unappropriated vacant land, which the state is entitled to recover. The owners of the Lewis survey are not shown to be asserting any title to the land in controversy, but appear to have accepted the resurvey of July, 1874, and to have accepted the patent issued thereon.

[7] We cannot determine upon what theory the trial court found that no vacancy existed between the Matlock and the Lewis surveys. Appellees contend that if the distance be run from the Marion county school land, which joined the H. & T. C. survey No. 37 on the west, eastward through said surveys 37, 38, and 39, the lower east line of No. 40 must be placed on the patented west line of the Lewis in order to give the lower south line of No. 40 its 1,338 varas in length. Regardless of the field notes, however, this position is untenable for the reason that the Marion county school land survey is junior to the H. & T. C. surveys themselves, and also because the lines of survey No. 39 were run out from the old established survey of John W. Massie on the east through surveys Nos. 30, 31, 32, and 33, which must control, instead of any calls from junior surveys on the west.

[8] The next issue raised is as to the true location of the east line of the Robert Gamble survey. P. S. Hagy, county surveyor of Montague county, made this survey November 27, 1874. At this time the field notes on which the Lewis was patented had been made establishing its west boundary as line C J shown on the map. These original field notes of the Gamble called to begin at the most southern southeast corner of survey No. 40 on the west boundary line of the A. A. Lewis survey, thence south with the Lewis boundary line 911 varas to corner; thence west, north, and east to the beginning. Subsequently by certificate dated March 28, 1876, filed in the general land office on November 1, 1876, the same surveyor corrected the original field notes by eliminating therefrom all calls for the line of the Lewis survey, and confining the beginning point of the Gamble survey to the corner of the Matlock survey No. 40.

[9] Through an error, however, when the patent to the Gamble survey was issued, its northeast corner was called for at the southeast corner of No. 40 on the line of the Lewis survey. However, so far as can be done, the steps of the surveyor on the ground must be followed, and his field notes, rather than those erroneously inserted in the patent will determine the location of the land. Undoubtedly the county surveyor of Montague county, after having made the field notes of the Gamble in 1874, discovered that the line of the Lewis had been moved eastward whereby a vacancy was created between the Matlock No. 40 and the Lewis, and that the lower southeast corner of No. 40 was not on the Lewis line as originally called for. He thereupon corrected his own field notes of the Gamble so as to eliminate all calls for the Lewis line, and as provided by law (see art. 5346, R. S. 1911) certified such correction to the commissioner of the general land office. Consequently, the location of the southeast corner of the Matlock survey No. 40, is conclusive of the location of the northeast or beginning corner of the Gamble, and the same vacancy occurs between its east line and the west line of the Lewis as between the Matlock survey and the Lewis.

[10] The next line called in question is the east line of the J. C. Cummings survey. The original survey of the Cummings was made by P. S. Hagy on the same day he surveyed the Gamble tract. He began at the northwest corner of the Gamble and ran west with the south line of No. 40, 432 varas; thence south 1,148 varas; thence east 1,343 varas "to a stake set on the W. B. line of a league and labor survey made in the name of Abel A. Lewis; thence north with said line 237 varas the S. E. corner of said Gamble survey; thence west with south boundary line of same 911 varas, his S. W. corner; thence north with his W. B. line 911 varas to the place of beginning."

These field notes were corrected by J. A. Kelly, county surveyor of Montague county on November 9, 1886. No material changes

were made in the original calls, however. The west line is called to pass the northeast corner of T. & N. O. section No. 6 at 90 varas south of the Cummings northwest corner. This was admittedly erroneous as to the location of said corner of No. 6. The new field notes also call for the Cummings southwest corner as the northwest corner of·survey No. 8. Otherwise the calls are the same as in the original field notes made by Hagy. Even though Hagy did not, so far as the record shows, at the time he corrected his original field notes of the Gamble survey, also correct those of the Cummings survey, so as to eliminate his call for the·Lewis line on the east, we think it is manifest that he built the Cummings survey upon the Gamble, and not upon the Lewis. No material objects were ·called for establishing corners. Ostensibly he had in mind as the west line of the Lewis the old field notes of that survey; i. e., the line E, H, on the accompanying map, as he did when he surveyed·the Gamble, instead of the patented line 394 varas east of that line. He began on the Gamble tract and closed his lower east line of the Cummings with a call north to the. Gamble southeast corner.. This corner, as above discussed, was at that time called to be in the west line of the Lewis, but this call was subsequently corrected by Hagy as being erroneous. Having already determined the location of the Gamble, the same vacancy of necessity exists between the Cummings and the Lewis.

Appellees contend, however, that the actual survey of the Cummings on the ground by Morris, county surveyor of Montague county, in 1923, shows an actual distance on its south line of 1,343 varas to the patented line of the Lewis, and that the original survey was intended to join the Lewis. In doing so, however, Morris moved the northwest corner of the Cummings east along the south line of section 40 approximately 400 varas east of the point ·called for in its original field notes, and in doing so created a vacancy between the John M. Swisher and the Day Land & Cattle Company surveys, when none is called for either in the field notes or in the patents of these surveys. It is manifest from the evidence that the west line of the Cummings as originally surveyed was approximately, if not exactly, an extension south of the boundary between surveys 39 and 40. For some 35 or 40 years it was so marked by a fence. line there. If that be taken as its west line, and the calls of the original field notes followed, the lower east line of the Cummings would be a continuation south of the east lines of the Matlock and Gamble surveys. The evidence clearly shows, we think, that the location of the Cummings survey was fixed by the location of the Gamble, and not by the patented west line of the Lewis, and that the same vacancy existed between the Cummings and the Lewis as between the Gamble and the Lewis, and the Matlock and the Lewis.

[11] The last question raised is as to the location of the east line ·of T. & N. O. survey No. 8. The original survey of this tract was made April 1, 1869. It was resurveyed in July, 1873. At that time, according to the then existing field notes of the Lewis, its west line began on the north at a point 2,961 varas west of the common Massie corner, being the point marked D on the map, and ran south to the Jack county school land. Its southwest corner was not established by permanent landmarks on the ground by either of·these two surveys; nor is its location established by definite calls for distance from recognized objects or corners on its south line, such as the Massie corner on its north line. The state's contention is, however, that by virtue of the calls north and south, the same distance between the different surveys obtains at·its southwest corner as at its northwest corner, that is, ·43 varas.

The T. & N. O. Ry. Company surveys Nos. 1, 2, 3, 4, 5, 6, and 7 began with the Marion county school land survey on their west and ran eastward, one being constructed upon the other by course and distance. None of them seem to have had corners established by natural objects, or permanent artificial objects on the ground. When survey No. 8 was made it called to begin at the southwest corner of the Lewis, to run west to the southeast corner ·of No. 7; thence north and on around closing with a call for the west line of the Lewis. It was patented in December, 1915, with these calls. The lands claimed as vacant are under fence by the owners of survey No. 8. The south line of No. 8 is called for in the field notes to be 1,075 varas long. The portion under fence however measured 1,118 varas, or the excess of 43 varas claimed by the state. The north line is called for in the field notes as 1,343 varas, and measured that distance to the fence on the Lewis west line. By going to the northwest corner of the Jack county school land and running east on its north line to the patented southwest corner of the Lewis, appellant's surveyors show an excess between the T. & N. O. surveys, according to their aggregate calls for distance, and the Lewis southwest corner, of 297 varas.

Appellees' surveyors, however, by beginning at what they show is an established east boundary line of the Marion county school land, upon which the T. & N. O. surveys were constructed, and running east through surveys 1, 4, 5, 7, and 8, giving each its distance called for in its field notes, show a conflict with the west line of the Lewis as patented, and a shortage of 172 varas in the T. & N. O. surveys. There was also evidence tending to show that the T. & N. O. surveys were intended to cover all vacant

lands between the Lewis survey and the Marion county school land. Without discussing the evidence further or summarizing it here, we have concluded that there was sufficient evidence to sustain the trial court's finding that no vacancy existed between T. & N. O. survey No. 8 and the Abel A. Lewis survey, and his judgment as to that will not be disturbed. The judgment of the trial court, as to appellees, Carl M. Worsham, Mrs. Alice Allen Talkington, and husband, Carl Talkington, and Vivian Allen Strode, and husband, S. Strode, is reversed, and judgment here rendered that the state recover from them the lands sued for as against them; and also that the state recover from the Gulf Production Company the lands so leased by it from said above-named parties. But as to the appellees, J. T. Prater, Nina M. Allen, and her guardian, Mrs. Alma Rennie, joined by her husband, C. W. Rennie, and as to the Gulf Production Company on the lands leased by it from the last-named appellees, the judgment of the trial court is affirmed.

Reversed and rendered in part, and in part affirmed.